**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-100041-RWZ |
| | ) | |
| BRYAN TORRES-ALMANZAR | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM[1]**

**INTRODUCTION[2]**

# "[W]e don't care what you are doing with the blicks [the guns].  *We care about money*"

**Statement made by Bryan Torres-Almanzar during initial meeting with ATF Cooperating Witness Two on September 13, 2017.  <u>See</u> Presentence Report at ¶ 15.**

---

1 Facts set forth in this memorandum come from the un-objected to portions of the Presentence Report, and the photographs, and the redacted discs and transcripts included in the Appendix.
2 This is the second sentencing in this case.  Although Torres-Almanzar has a more significant criminal history than co-defendant Valentin and, unlike Valentin, was directly involved in jail conversations with Jose Ilarraza setting up the buys (and is therefore both a more serious defendant and a more culpable one, the activities of Valentin and Torres-Almanzar in actually selling all of the guns and ammo were essentially identical.  Therefore, substantial portions of this Sentencing Memorandum are identical to Valentin's.

> .22/.25/Revolvers = Negotiable
>
> 9mm/.380 = $800 = Firm!
>
> .40/.45 = $1,200 = Firm!
>
> Glizzy 9mm/.380 = $1,000 = Firm!
>
> Glizzy .40/.45 = $▮▮1,400 = Firm!
>
> Small Yoppa = $2,400 = (Negotiable)!
>
> Yoppa = $3,000 = (Negotiable)!
>
> All includes Food plus extras
>
> Green beam = 350
> Red beam = 250

The document reproduced above is a "price list" for firearms sold by Eric Valentin and Bryan Torres-Almanzar   and provided to the ATF Cooperating Witness who made the gun purchases in this case ("CW-2").[3] Valentin provided the price list on October 4, 2017 (in front of Torres-Almanzar) after he and Torres-Almanzar had already sold CW-2 six guns, eleven

---

3 Three CWs were used by the ATF in the underlying investigation.   CW-1 was in the prison and made the initial contact with Ilarraza by telling him he need a source for guns that he wanted to purchase so they could be shipped to the Dominican Republic.   PSR at ¶ 9.   CW-2 was then used to make the actual purchases from Valentin and Torres-Almanzar. CW-3 merely acted as a conduit to get the ATF information.

magazines, and two hundred ninety eight rounds of ammunition. From that date (October 4, 2017) to October 19, 2017, the defendants sold CW-2 five more firearms, seven more magazines, and fifty-eight rounds of ammunition all for a total price of twelve thousand three hundred dollars ($12,300). See Presentence Report (6/7/18) ("PSR") at ¶ ¶ 8-42.

The price list contains several terms that might require explanation. "Glizzy's" are a street term for firearms manufactured by Glock, generally recognized to be a high quality gun favored on the street.  "Yoppa's" are a street term for assault-type weapons such as the Cobray .380 caliber pistol sold on September 28, 2017 for $2,400 and the Adler AP80 rifle sold by the defendants on October 19, 2018 with a high capacity magazine for $3,400.  See Appendix Tabs A-4 and A-6.  The reference to "red and green beams" in the price list are to guns, like the Ruger Torres-Almanzar and Valentin delivered on September 14, equipped with a laser sight (that permits the user to aim at his target the weapon using the built-in laser).  "Food" is a common street term for ammunition and "extras" include such things as the additional magazines that were provided with five of the guns sold.  See Appendix Tabs A-1-2, 3, and 5.

The price list is stark evidence of the scope and sophistication of the trafficking crimes at issue here in which Valentin and Torres-Almanzar sold guns with laser sights, guns of high power (caliber), what they believed to a fully automatic machine pistol, and a long "assault type" rifle with a high capacity "banana clip." See PSR at ¶¶19 (sale of Ruger 9mm equipped with laser sight); 31 (September 28, 2017 sale of Cobray pistol with barrel extension that Valentin and Torres-Almanzar stated was "fully automatic"); 32 (sale of 3 semi-automatic pistols that included two .45 caliber weapons along with 58 rounds of what the defendants said was hollow point ammunition); 35 (October 19 sale of Jager AP80 assault type rifle with extended magazine). During every buy, Valentin and Torres-Almanzar encouraged CW-2 to order more guns and assured CW-2 again and again they would be able to supply CW-2 with whatever he needed

3

because they were regularly being shipped "crates" of guns from unknown sources. See, e.g., PSR at ¶¶15 (during initial September 13 meeting, Torres-Almanzar told CW that they had a "duffle bag [10, 20, 30] of guns to sell" and they could do deals "by the bundle" and Valentin told CW-2 that "Whatever you need, it doesn't matter" and stated, he could make deliveries every day);[4] 23 (During September 14 buy, Valentin and Torres-Almanzar told CW-2, "We do business and will take care of you," "we are in the business of growing our organization" and assured CW-2 that they had "plenty of guns."); 36 (During final sale on October 19, Torres-Almanzar and Valentin told CW-2 that they regularly receive shipments in crates and would be able to sell whatever they received.").

Unfortunately, the sources of those guns will probably never be known because *every one* of the firearms purchased by CW-2 had its serial numbers so thoroughly obliterated (often with what appeared to be a drill press) that no restoration was possible.   When CW-2 asked Valentin and Torres-Almanzar how the obliterations were done, the two men laughed and told CW-2 that they "had a method" and "to leave that to us."   PSR at ¶28.

But as serious as the gun trafficking in this case was, other videotaped statements the defendants made show them to be even more serious.   For starters, Valentin and Torres-Almanzar both showed that they were illegally carrying personal weapons in Massachusetts during at least two of the sales.   See PSR at ¶¶ 23 (Valentin and Torres-Almanzar lifted up their shirts during September 14 buy while Torres Almanzar assured CW-2 that he and Valentin had "plenty of em [guns]"); 27 (During September 19 buy, both men again showed CW-2 their personal weapons).   Pictures of Valentin and Torres Almanzar displaying their personal weapons can be found in Appendix 1 at Tab A-2 pages 10 and 15 and at Tab A-3 at pages 24 and

---

4 During this same meeting, Torres-Almanzar also told CW-2, "[W]e don't care what you are doing with the blicks [the guns].   *We care about money"* PSR at ¶ 15.

26.

Both men also repeatedly indicated their willingness to sell CW-2 "Manteca" (a street name for heroin) along with their guns.   See PSR at ¶22 (Valentin told CW-2 that if he had anything that that might benefit "them both, such as the sale of "manteca" CW-2 should say so because he and Torres-Almanzar had "soldiers" [that Valentin described as "big boys"].   Torres-Almanzar then told CW-2 that "We have the supply to do whatever niggers need to do" and Valentin added "We are in the business of growing our organization"); 28 (Torres-Almanzar and Valentin told CW-2 they could get him a "baby" AR [assault rifle], and could get CW-2, "clips a small .25 caliber pistol and "Manteca"); 31 (after Torres-Almanzar reminded CW-2 that he "knew exactly what CW-2 was doing" and that "it had nothing to do with me," Valentin and Torres-Almanzar told CW-2 that they could supply 70 grams of "Manteca" for less than CW-2 had said he was currently paying for 62 grams).

Even more disturbing were the statements that the defendants made that they had soldiers available if CW-2 had someone he wanted to rob or "wipe" out."   PSR at ¶28 (Valentin explained to CW during the September 19 buy that they "got soldiers" and told CW-2 that if he had any "licks that we got to hit,"[5] "or any bugs y'all niggers need wiped out,"   they could take care of it because they "wipe niggers out.").   During the October 19 purchase, Valentin and Torres-Almanzar also told CW-2 (once again on video) that they were members of the Latin Gangsta' Deciples Street gang. PSR at ¶36.

The government has provided Probation with a detailed Statement of the Offense Conduct that is now set forth in the PSR at ¶¶12-42 and is based on the pictures and video taped conversations made during meetings and gun sales that Valentin and Torres-Almanzar made

---

5   "Licks" is a street term for robbery. PSR at ¶ 28 n. 6

between September 13 and October 19, 2017.   Although Torres-Almanzar has asserted a number of objections to the PSR, none contest that Valentin or Torres-Almanzar actually made the statements attributed to them.   Those objections are rather based on the dubious assertion that these two men, who produced whatever kind of guns CW-2 asked for whenever CW-2 wanted to buy them and repeatedly urged him to buy more guns, heroin and identify people who the CW wanted robbed or "wiped out," they really didn't mean what they said during all these conversations and that the specific statements they made should be disregarded.   The simple response to this assertion is that the defendant's actions in selling so many guns and ammo speak louder than their words.

In addition to the detailed chronology in the PSR, the government is providing the Court with an Appendix containing four things to help explain and corroborate what Valentin did and said over the course of the six separate gun buys made in the underlying investigation. Tab A to the Appendix are photos of the firearms, magazines, and rounds of ammunition purchased from Valentin and Torres-Almanzar during the course of the underlying investigation.   Also included in those photos are stills taken from the various buy videos that show that Torres-Almanzar was not only present during each of the buys, but that he handled either the guns or the money during every one of them and displayed his personal weapon twice.   The remaining contents in the Appendix (under Tabs B and C) are excerpted videos from the September 14 and 19 buys and transcripts of those excerpts that graphically demonstrate the enthusiasm and persistence as Valentin and Torres-Almanzar sold gun after gun after gun and tried to persuade CW-2 to buy more.[6] Given the seriousness of the offenses in this case and the serious manner in which Torres-Almanzar carried them out, a sentence at the low end of the guideline sentencing range is

---

6 The government urges the Court to review these excerpted videos before Sentencing or is prepared to play the videos at the sentencing hearing.

fully justified.[7]  The reasonableness of that sentence is of course inconsistent with the 36-month

sentence given to Eric Valentin.

## CALCULATING THE GUIDELINE SENTENCING RANGE

The initial PSR in this case was issued on August 29, 2018.   Probation concluded that

the defendant has a Total Offense Level of 27, a CHC of IV, and a GSR of 100-108 months.[8]

PSR at ¶¶ 46-62 (Offense Level Computations); 64-66 (Criminal History Calculations); 115

(Advisory GSR).   The government believes that the correct Criminal history is III based on

tdefense counsel's objection.   Given that change, the correct GSR is 87-108 months.   Because

the low end of Torres-Almanzar's GSR is 25% higher than Valentin's (based on his criminal

history), the government believes that Torres-Almanzar's sentence should be at least 25% higher

than Valentin's or at least 43 months.

In reaching this result, Probation imposed the following enhancements to the BOL of 12

found in USSG 2K2.1(a)(7): +4 (because the defendants sold between 8 and 12 firearms);[9] +4

(because all of the firearms had obliterated serial numbers);[10]  +4 (because the defendants

engaged in the trafficking of firearms);[11]  +4 (because the defendants transferred the firearms

with knowledge or reason to believe that they would be transported outside the United States);[12]

---

7  Both counts of conviction contain five-year maximums. See 18 U.S.C. § 371(conspiracy to deal in firearms without a license); 18 U.S.C. § 922(a)(1)(A). Therefore, to impose a sentence of 70 months (the low end of the applicable guideline range), it will be necessary to impose the sentence consecutively.   See USSG §5G1.2 Application note 1 ("Usually, at least one of the Counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. . . . .If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment.").
8  The original guideline range was 100-110 months based on a CHC of IV.   The government agrees that the offenses listed in paragraph 66 should not have been scored and that the correct CHC is III.
9  USSG §2K2.1(b)(1)(B)
10  USSG §2K2.1(b)(4)(B)
11  USSG §2K2.1(b)(5)
12  USSG §2K2.1(b)(6)(A)

+2 (because the defendant was an organizer, leader, manager or supervisor of an organization that did not involve 5 or more participants or was otherwise extensive);[13] -3 (for timely acceptance of responsibility).[14]   All of this produces a TOL of 27, a CHC of III, and a GSR of -87-108 months.

Torres-Almanzar has only objected to the last two enhancements (role and exportation of guns). PSR at pages 33-36. Because the government believes that both enhancements were properly assessed and that the Court should adopt the guideline calculations in the PSR, these objections should be overruled, just as they were at the sentencing of Valentin.

A.  **The two-level role adjustment**.  The first contested guideline enhancement is the two-level role adjustment made by Probation. PSR at ¶56.   The videos in this case are filled with statements made by Valentin and Torres-Almanzar regarding the growth of their "Organization" and the many "soldiers" they had to perform tasks for them. See PSR at ¶10 (Torres-Almanzar, while in the company of Valentin on September 14, tells CW-2 that Ilarraza [the third defendant who set up the initial deal from prison) is in the process of "growing our organization"); ¶ 15 (During September 13, meeting Torres-Almanzar and Valentin said they had "soldiers" (individuals working for them) in New Hampshire, Lawrence, and Lowell, and that these individuals could deliver whatever CW-2 needed, whenever CW-2 needed it.); ¶ ¶22-24 (During September 14 buy, Valentin told CW-2, "We are in the business of growing our organization" and reiterated that they had "soldiers" and the supply to do whatever niggers need to do; Valentin and Torres-Almanzar told CW, "We can meet in Lawrence, we can meet in Lowell, we got soldiers in both cities" and that they had niggers working under us")." ¶ 31 (During September 28 buy, Valentin and Torres-Almanzar refer to themselves as "one top goal organization" that had

---

13 USSG § 3B1.1(c)
14 USSG §3E1.1(a)

"soldiers" to go whenever needed).

Notwithstanding all this, Probation limited the role enhancement to two levels based on the September 13 delivery of the first gun by an individual only identified as "Ice."   As the Court may recall from the PSR, Valentin and Torres-Almanzar agreed to deliver the first gun (that had been paid for by the ATF depositing $700 in Ilarraza's canteen account at the Middleton House of Correction) and then sent CW-2 to a meeting with a young Hispanic male identified as "Ice" who delivered the gun on the defendants' behalf. PSR at ¶ ¶ 9, 17-18.

In view of all this, the claim that only the three defendants were involved in the charged offenses is simply wrong.   Apart from the many times that either Valentin or Torres-Almanzar (or both) talked about their "soldiers" and the growth of their "Organization," there was a third male at the meeting at the Market Basket. PSR at ¶ 4. More importantly from a role perspective, Valentin and Torres-Almanzar also had a fourth male ("Ice") deliver a firearm to CW-2 shortly after the meeting.   And when Valentin and Torres-Almanzar met again a day later so that they could deliver a second gun to CW-2, they made it very clear that "Ice" was working for them:

> VALENTIN: You got the 2400 [money for the three guns purchased on September 19]?
> CW: Yeah my nigger, just give me a few days cause I gotta do some moves..that's what I do.
> TORRES-ALMANZAR: That's fine bro, you just hit me up, feel me? You got the numbers so you just hit me up …money
> VALENTIN: Cause like I said, we got soldiers, you let us know
> CW: Blick
> VALENTIN: Opportunity
> TORRES-ALMANZAR: Like the nigger you met yesterday that's one of our niggers got niggers out there
> CW: He was young, he was young, right?
> TORRES-ALMANZAR: Yeah, we got niggers under us that's how it is bro
> VALENTIN: We thought after yesterday, you should see us again just to make sure everything was good
> TORRES-ALMANZAR: Yeah, exactly. Sometimes you gonna meet us, sometimes you gonna meet them bro, feel me? That's regardless there's not going to be any funny business I mean cause we the heffers my nigger and we tell them what to do
> CW: You the heffers (laughs) that high
> VALENTIN: Like I said, we can meet in Lawrence, we can meet in Lowell we got

9

soldiers in both cities.

E-6 at 17:14:28; Appendix Tab B-2 at 7-8.   In clear language, the defendants stated that the male who delivered the gun was working under them and that they were the leaders (or "heffers"). Therefore the two-level role enhancement assessed by Probation should be affirmed here as it was for Valentin. E.g., United States v. Voccola, 99 F.3d 37, 44 (1st Cir. 1996)(upholding role adjustment where district court relied on defendant's own words in "which he expressly admits managing the actions of another"). See also United States v. Savoie, 985 F.2d 612, 616 (1st Cir. 1993) (recognizing that a defendant need not be the head of a conspiracy in order to warrant managerial role-in-the-offense enhancement.").

**B.   Exportation Enhancement.**   The other enhancement contested by Torres-Almanzar (and that was also unsuccessfully contested by Valentin at his sentencing) is the exportation enhancement that appears at USSG 2K2.1(b)(6)(A).   In pertinent part, it provides that if a defendant possesses any firearm or ammunition with knowledge, intent, or *reason to believe* that it would be transported outside the United States, then the Defendant's Offense Level must be increased by 4.   The application of that enhancement should be affirmed in this case just as it was in Valentin's.

The Sentencing Commission added the exportation enhancement in 2011 because the Commission believed that possessing a gun with knowledge or reason to believe that it would be transported out of the United States is conduct sufficiently similar in seriousness to possessing a firearm with knowledge or reason to believe that it would be used in another felony offense to warrant similar punishment. USSG Amendment 753 (Effective November 1, 2011). It is useful from an investigatory standpoint because the fact that the trafficked guns are leaving the country will invariably make any trace even more difficult and thereby give traffickers greater comfort that they will not get caught.

Application of these principles here show that Probation's assessment of the Exportation Enhancement should be upheld.   The jail calls between CW-1 and Ilarraza made clear that Ilarrazza was told by CW-1 that the guns were headed to the Dominican Republic and that he then passed this along to Torres Almanzar.   See Exhibit 1 and 2 appended hereto (report entitled "Review of Jail Recordings" that show that Ilarraza advised Torres-Almanzar that the guns being sold to CW-2 were going to be trafficked to the Dominican Republic, with Ilarraza stating "that shits not going to stay here, that shit's going straight to the Dominican Republic" to which Torres-Almanzar replied "I don't really care what he does with it bro feel me that's [UI] out of my hands bro feel me."   In the meeting on September 13 at the Market Basket, Torres Almanzar told CW-2 (with Valentin present ) "we heard that you were getting them shits to the DR, that's what we heard" to which Torres-Almanzar then said "we want in" and Valentin said,   If its like that, we'll feed you."   Recording E-2 at 17:05:49.   Yet more evidence relevant to Torres-Almanzar's knowledge is a September 14 jail call (attached to the government's appendix as Exhibit D (pages 5-6) in which Torres-Almanzar and CW-1 have the following conversation:

> CW-1: What it-what it I'm making the money-I'm making-I like that money bro.
> **TORRES-ALMANZAR:**   Of course.
> CW-1:   I'm in here, bro.   I'm not making the money, fool.
> **TORRES-ALMANZAR:**    Yeah.
> CW-1: I don't know—but I started doing this-I started to do it for when I arrive in Santo Domingo, bro-to have something with which to make a couple of bucks—you understand?
> **TORRES-ALMANZAR:**   Uh-huh.
> CW-1:   So I'm here as you already know.
> **TORRES-ALMANZAR**:   But that's going over there, right?
> CW-1 Yeah bro.   That's direct—that goes directly over there.

These statements are more than adequate to demonstrate that all defendants transferred every firearm with knowledge, intent, or reason to believe that it would be transported "out of the United States."   USSG §2K2.1(b)(6)(A).   E.g., United States v. Mendoza, 556 Fed Appx 326 (5th Cir. 2014) ("Based on the plain language of § 2K2.1(b)(6)(A), the [undercover officer's]

11

statement that he told Mendoza the firearms were going to Mexico provided sufficient support for the enhancement for "transferr[ing] any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States." § 2K2.1(b)(6)(A)"); United States v. Pratts, 610 Fed. Appx 953 (11th Cir. 2015)(upholding enhancement where CI told defendant he purchased guns to "send them to Mexico") . See also United States v. Villa Caravajal, 516 Fed. Appx (11th Cir. 2013) (rejecting claim that enhancements for trafficking and exporting firearms were double counting).

Based on the foregoing, Probation's Guideline Calculations should be accepted by this Court and the GSR should be set at 87-108 months.

### SECTION 3553(a) FACTORS

The government believes that, but for the sentenced given Valentin, several section 3553(a) factors support its position that a sentence at the low end of the GSR is warranted in this case.

### 1.   Nature of the Offenses

In the government's view, gun trafficking is one of the most serious blue collar offenses prosecuted in this district.   Each year, hundreds of people throughout the Commonwealth either die or are injured by being at the wrong end of the gun.   In the vast percentage of those shootings (particularly in urban areas like Lawrence and Boston) the guns are illegally acquired from individuals like Torres-Almanzar and his co-defendants who peddle these dangerous weapons for profit.   And as Valentin and Torres-Almanzar made clear to CW-2, they couldn't have cared less about the damage that their weapons would end up doing.   Rather, they just "care[d] about the money." PSR at ¶15.

### 2   Gun Dealing in Massachusetts

Unfortunately traffickers like Torres-Almanzar help support a steady supply of illegal guns into Massachusetts cities.   In 2012, for example, ATF traced 1600 guns seized through law

enforcement efforts in the state.   See ATF website at

https://www.atf.gov/search/site/trace%20information%20guns%20massachusetts.   In 2013, the

number of guns seized and traced dipped slightly to 1571.   Id.   Stemming the supply of illegal

guns into Massachusetts requires an ongoing effort by law enforcement.   For example, in 2012

only 453 of the guns traced were originally purchased in Massachusetts, leaving an alarming

total of 1147 guns that were purchased outside of this state.   Id.   And the data from 2013 is

nearly the same.   In 2013, only 431 of the guns traced were originally purchased in

Massachusetts, with 1140 guns that were purchased outside of this state.   Id.

The use of such guns in violence is also epidemic in this country.   One need only read

the newspaper each day to recognize the seriousness of gun violence and the need to deal with

firearms trafficking cases accordingly.   In United States v. Politano, 522 F.3d 69 (1st Cir. 2008),

for example, in affirming an *above-guideline sentence in a firearms trafficking case*, the First

Circuit noted the sentencing judge's reference to the "epidemic of handgun violence in

communities within this district" and concluded that the district court "has the authority to

conclude that the impact of this particular offense is more serious than that reflected by the

Sentencing Commission."). Here, by contrast, the government only seeks a sentence at the low

end of the applicable GSR.

"Gun violence remains a serious public health and safety problem in the United States. In

2009, a total of 9,146 people were murdered with firearms, and it is estimated another 48,158 were

treated in hospitals for gunshot wounds received in assaults."   Andrew V. Papachristos, Ph.D.,

Anthony A. Braga, Ph.D. & David M. Hureau, M.P.P., *Six-Degrees of Violent Victimization:*

*Social Networks and the Risk of Gunshot Injury* 3 (February 28, 2011).

Illegal guns used to commit violent crimes are acquired from those persons who procure

them and ship them into this state -- people like Torres-Almanzar and his co-defendants.   It

follows that illegally obtaining, and shipping guns into this state to sell once they are made untraceable is anything but a victimless crime.

Here, Torres-Almanzar's conduct is exceedingly serious even if he and Torres-Almanzar hadn't offered to also sell heroin, rob anyone that CW-2 identified, or "wipe people out."   Their perspective cannot be overlooked in imposing an appropriate sentence.   The access to, and sale of the high powered weapons at issue in this case justifies a lengthy period of incarceration by itself.

### 3.      Deterrence

The court should also consider proper deterrence in fashioning a sentence.   See 18 U.S.C. § 3553(a)(2)(B)(the district court may impose a sentence "to afford adequate deterrence to criminal conduct").

### A)      The need for specific deterrence

It's hard to determine just how to effectively communicate the message to a defendant hell-bent on trafficking firearms, i.e., that it's patently wrong, that it leads to horrible results, and just cannot be allowed in this society.   Prosecutors frequently rely on that the defendant has been "down this road before" when seeking enhanced sentences.   And here, Torres-Almanzar (despite his youth) already had a firearm offense on his record.[15]   Clearly, he needs to "get it" after serving federal prison time for the first time and then being monitored by this court's probation office.   Given the fact that Torres-Almanzar had already committed a firearm offense and was on DYS parole at the time he committed the offenses here,[16] a longer sentence that the

---

[15]      See PSR at ¶¶64-67 (Valentin has one juvenile case for attempting to steal a car in 2011, zero Criminal history points and has a CHC of I).

[16] See PSR at 66 (defendant committed to DYS custody on armed robbery/firearm offense)

14

one given Valentin is appropriate both to deter him and others who may consider getting into the gun trafficking business.

### B)    The need for general deterrence

The desire to slow, or for that matter to stop altogether others from following in Valentin's footsteps is a lofty and critical goal.   Massachusetts residents deserve our help in stemming the tide of illegal guns available for sale particularly in high crime locations like Lawrence.

The requested sentence will thus serve important general deterrence purposes.   The government requests that a message be sent to others, similarly situated to Torres-Almanzar, who may consider illegally selling guns in Massachusetts.   The message should be unmistakably clear, that selling illegal firearms in our state will not be tolerated and carries with it stiff sentences.   See 18 U.S.C. §3553 (a)(1)(B)(sentencing goals include the need to afford adequate deterrence to criminal conduct).   See also United States v. Cavera, 550 F.3d 180, 196 (2d. Cir. 2008)(in affirming above-guideline sentence based on local concerns about gun trafficking, Second Circuit Court of Appeals noted that, "The environment in which a crime was perpetrated may, in principle, inform a district court's judgment as to the appropriate punishment in any number of ways;" thus, "New York's strict gun control laws created a larger black market for guns than in places with less strict laws, so that a more severe penalty for trafficking guns into New York City was necessary to bring about adequate deterrence."). See Philip J. Cook et al., Guns and Violence Symposium: Regulating Gun Markets, 86 J.Crim. L. & Criminology 59, 72 (1995) ("In cities such as New York and Boston, where the prevalence of gun ownership is low because legal transactions are subject to onerous regulations or are banned, prices in the secondary market are higher than in other east coast locales.... As a result, dealers have long been

able to make a profit by buying guns in Virginia or points south and running them northward to the street markets of northeastern cities."); Gary Kleck, BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals, 18 St. Louis U. Pub.L.Rev. 23, 28-29 (1999) (explaining that in cities subject to "unusually strict gun laws ... opportunities for gun traffickers to profit should be at their maximum").

Deterrence is important because it can work to reduce crime and the misery so often imposed on innocent victims of gun offenses.   See, e.g., McDowell et al, "A Comparative Study of the Preventative Effects of Mandatory Sentencing Laws for Gun Crimes," 83 Journal of Criminal Law and Criminology 378-394 (1992) (mandatory sentences for gun crimes reduced violent crime in six cities).

For the reasons also discussed, it is particularly important in places like Massachusetts and for crimes like gun trafficking.   But deterrence must be effectively communicated to be successful.   At least one commentator has correctly recognized that "the deterrence threat may best be viewed as a piece of advertising." Zimring and Hawkins, *Deterrence, the Legal Threat in Crime Control,* p.142 (Univ. Of Chicago Press 1973).   Through its decisions, this Court is an important messenger to the target audience perpetrating the violence. Compare Skogan et al,(eds) *Fairness and effectiveness in Policing: the Evidence (*National Academies Press 2001) at 6 ("Research has found that people obey the law not just because they are afraid of being punished or because they believe the law is morally right, but also because they believe the law and its enforcement is impartial and being fairly administered") with United States v. Bannister, 786 F.Supp.2d 617, 660 (E.D.N.Y.)("General deterrence particularly may be impaired when the perceived injustice of punishment damages the credibility of the justice system").   On the other

16

hand, messages that take into account the seriousness of gun violence and the need to protect public safety by imposing sentences at least within the guidelines on traffickers of guns can help make communities safer and deter others from committing the same crimes.

### 4.      Protect the Public

The danger faced by the public from the sale of illegal guns into this state is significant and is also a critical area for consideration.  See 18 U.S.C. § 3553(a)(2)(C)(the district court may impose a sentence "to protect the public from further crimes of the defendant").   Here, the danger comes from the kinds of guns that Valentin and his co-defendant's trafficked, the persistence with which they did it, the number of guns they sold, and the manner in which they sold their high powered semi-automatic weapons (all with deeply obliterated serial numbers, some with laser sights or high capacity magazines (or extra magazines) so that a user could carry more ammunition. Id.   Because the risk to public safety is increased by all these factors (without even mentioning the fact that Valentin and Torres-Almanzar believed they had sold at least one fully automatic machine pistol and one assault type weapon with an extended magazine, were prepared to also sell the CW heroin and were interested to know if the CW had anyone he wanted to rob or "wipe out," the sentence this Court imposes should reflect that risk by falling within the applicable guideline range.

### THE IMPACT OF VALENTIN'S 36 MONTH SENTENCE

The government recognizes that neither it nor the Court can be oblivious to the substantial variance given to Valentin and the similarity of his criminal conduct in selling all these guns.   But Torres-Almanzar is different in at least two respects that support a higher sentence.   The first is his criminal history which, as has already been noted, arose out of other firearms activity--an armed

17

robbery using a gun. PSR at ¶ 65. The resulting increase in Torres-Almanzar's GSR also supports a higher sentence because of his close relationship with Ilarraza who set up the arrangement with CW-1 while both were incarcerated in the state. As already noted the difference between the GSR here and the GSR in Valentin's case is 25%. Thus, the sentence here should be 25% greater.

## SUPERVISED RELEASE

The government is asking the Court to place the defendant on Supervised Release for 3 years. It joins in the Special Conditions sought by Probation and asks the Court to give a judicial recommendation for RESTART.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By: s/ John A. Wortmann, Jr.
JOHN A. WORTMANN, JR
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/s/ John A. Wortmann, Jr. 12/11/18
JOHN A. WORTMANN, JR.